UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

NEW YORK CITY EMPLOYEES' RETIREMENT
SYSTEM, et. al.,

      Plaintiffs,

v.

AMERICAN INTERNATIONAL GROUP, INC.,
MAURICE GREENBERG, MARTIN J. SULLIVAN,
HOWARD SMITH, MICHAEL J. CASTELLI,
CHRISTIAN MILTON, L. MICHAEL MURPHY and
FRANK H. HOENEMEYER,

      Defendants.

------------------------------------x

Case No. 05 CV 6894

COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED



RECEIVED AUG 02 2005 U.S.D.C. S.D.N.Y. CASHIERS

      Plaintiffs New York City Employees' Retirement System, New York City Teachers' Retirement System, New York City Fire Department Pension Fund, New York City Police Pension Fund, New York City Board of Education Retirement System, New York City Police Superior Officers' Variable Supplements Fund, New York City Police Officers' Variable Supplements Fund, New York City Fire Officers Variable Supplements Fund, New York City Firefighters' Variable Supplements Fund, and New York City Teachers' Retirement System Variable Annuity A Program (collectively referred to as "Plaintiffs" or the "NYC Pension Funds") by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, their investigation, including without limitation: (a) review and analysis of filings made by American International Group, Inc. ("AIG" or the "Company") with the Securities and Exchange Commission ("SEC"); (b) the complaint filed in the action captioned *In re American International Group, Inc.,*

*Securities Litigation*, currently pending in this District, and docketed at No. 04 Civ. 8141 (JES) (AJP); (c) complaints filed by the SEC and the Office of the Attorney General for the State of New York ("NYAG") against AIG; (d) press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning AIG; and (e) other publicly available information about AIG.

## JURISDICTION AND VENUE

1.     The claims alleged herein arise under Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

2.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 133.

3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

4.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## NATURE OF THE ACTION

5.     This action arises out of a massive fraud conducted by AIG over the course of five years. In an extraordinary admission, AIG announced that it had intentionally engaged in numerous accounting maneuvers solely in order to "enhance measures important to the financial

2

community." As a result of its accounting machinations, the Company is required to restate more than four years of financial statements wiping out over $2.7 billion of the Company's net worth. In all, the restatement reduced 2004 profit by 12% or $1.32 billion and reduced AIG's net income from 2000 through 2004 by $3.9 billion, or *10%.* AIG's common stock price substantially declined as a result of the disclosures of the Company's accounting machinations causing economic loss to the plaintiffs. Prior to receiving subpoenas from the SEC and Attorney General Elliot Spitzer, AIG's stock price closed at $73.12 on February 11, 2005. By April 1, 2005, following AIG's disclosure that it would delay the release of its Form 10-K, its stock price closed at $50.95 wiping out almost $60 billion in market capitalization.

6. In the Company's Form 10-K, filed with the SEC on March 31, 2005, AIG admitted to a host of violations, including that AIG and its management: (i) engaged in sham transactions solely to increase reported reserves and income; (ii) made "top-level adjustments" to further boost reserves; (iii) engaged in transactions with related offshore entities; (iv) disguised underwriting losses as investment losses; (v) created false underwriting income through life insurance business; and (vi) had an abundance of internal control failures.

7. Investors first began to learn about the Company's violations when on Monday, February 14, 2005, AIG issued a release stating that subsequent to its earnings release on Wednesday, February 9, 2005, the Company had received subpoenas from the State of New York and the SEC relating to investigations of "non-traditional insurance products and certain assumed reinsurance transactions and AIG's accounting for such transactions" (the "February Press Release").

3

8. On February 14, 2005, the *Wall Street Journal* reported that a large reinsurance transaction between AIG and Berkshire Hathaway's General Reinsurance Corporation ("General Re") was the focus of the SEC investigation.

9. On March 13, 2005, press reports suggested for the first time that the AIG Board was reviewing the future of Defendant Greenberg as a result of the ongoing investigation into the reinsurance transaction between AIG and General Re. Later that day, reports circulated that Greenberg was close to stepping down. On March 14, 2005, Greenberg announced he would step down as CEO but would remain chairman.

10. On March 30, 2005, AIG announced that contrary to prior disclosures it would not be filing its annual report on Form 10-K for 2004 on a timely basis.

11. On May 31, 2005, AIG filed its long-awaited restatement, reducing profits by nearly $4 billion over a four-year period. The Company restated its financial statements for the years 2000 through 2003 and the quarters ended March 30, June 30 and September 30 for 2003 and 2004 and the quarter ended December 31, 2003 and adjusted year-end 2004 financial statements. The Company announced that its net income for 2004 would be $1.32 billion less than previously disclosed in the February Press Release. Net income for 2003 would be $1.27 billion less than previously reported. For 2001, net income had been overstated by $1.19 billion. Further, the Company's Form 10-K identified serious internal control failures.

12. In the restatement the Company also admitted that it engaged in a massive accounting fraud, stating that its improper accounting was orchestrated to *"enhance measures important to the financial community and may have involved documentation that did not accurately reflect the true nature of the arrangements."* (emphasis added).

## THE PARTIES

### Plaintiffs

13.     Plaintiffs purchased common stock issued by AIG at prices artificially inflated by defendants' wrongful conduct and collectively incurred losses in excess of $100 million in connection with those transactions when AIG revealed its accounting machinations.

14.     Plaintiffs are the actuarial pension systems of New York City. The Funds include the New York City Employees' Retirement System ("NYCERS"), the Police Pension Fund, the Fire Department Pension Fund, the Teachers' Retirement System, the Board of Education Retirement System, and five variable supplements funds. As of June 30, 2004, the date of the most recent actuarial valuations for these Funds, the NYC Pension Funds had 258,609 retired members and 347,575 active members.

15.     NYCERS, established under Section 12-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not eligible to participate in the separate Fire Department, Police Department, Teachers, or Board of Education pension funds.

16.     The New York City Teachers' Retirement System ("NYCTRS") maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity Program ("TDA"). The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the Board of Education. The TDA, established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring income tax payments on voluntary tax deferred contributions.

17. The New York City Fire Department Pension Fund ("FPF"), established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.

18. The New York City Police Pension Fund ("PPF"), created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department.

19. The New York City Board of Education Retirement System ("BERS") provides pension benefits to, among others, non-pedagogical employees of the Board of Education.

20. The New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), the New York City Police Officers' Variable Supplements Fund ("POVSF"), the New York City Firefighters' Variable Supplements Fund ("FFVSF"), the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and the New York City Teachers' Retirement System Variable Annuity A Program ("NYCTRS Variable A") were established, pursuant to enabling State legislation, to provide certain retirees of the New York City Police Department, the New York City Fire Department, and the New York City Board of Education with supplemental benefits from variable supplement funds.

**Defendants**

21. Defendant AIG is a holding company that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in the United States and worldwide. AIG member companies are the largest underwriters of commercial and industrial insurance, with approximately 86,000 employees and $81 billion in annual revenues. In 2003, AIG's operations were conducted principally through four operating segments: (1) General Insurance (multiple line companies writing substantially all lines of property and casualty insurance); (2) Life

6

Insurance (traditional insurance and financial and investment products); (3) Financial Services (involved in the derivatives dealer market and structured transactions and investments in diversified portfolios); and (4) Retirement Services and Asset Management (investment vehicles and services, including variable annuities, mutual funds and investment asset management). AIG makes a profit by serving commercial, institutional, and individual customers through an extensive worldwide property-casualty and life insurance network. AIG's shares are traded on the New York Stock Exchange under the ticker "AIG."

22.     Defendant Maurice Greenberg ("Greenberg") was at all relevant times the Chief Executive Officer and Chairman of the Board of AIG. Greenberg prepared, signed and certified the false and misleading press releases and public SEC filings.

23.     Defendant Martin J. Sullivan ("Sullivan") was at all relevant times AIG's Vice Chairman and Co-Chief Operating Officer. In March of 2005, Sullivan was elected CEO after Greenberg was forced to resign.

24.     Defendant Howard Smith ("Smith") was at all relevant times the Chief Financial Officer and Vice Chairman of AIG. Smith prepared, signed and certified the false and misleading press releases and public SEC filings.

25.     Defendant Michael J. Castelli ("Castelli") was at all relevant times the Vice President and Comptroller of AIG. Castelli signed the Company's false and misleading annual reports filed on Forms 10-K for the years 2000 through 2003.

26.     Defendant Christian Milton ("Milton") was at all relevant times the Vice President of AIG in charge of reinsurance.

27. Defendant L. Michael Murphy ("Murphy") was at all relevant times a senior executive at AIG. Murphy was fired by AIG in March of 2005 after he refused to answer questions by government regulators.

28. Defendant Frank J. Hoenemeyer ("Hoenemeyer") was at all relevant times a director of AIG, member of the Board's Audit Committee and chair of the Audit Committee in 2003. Hoenemeyer signed the Forms 10-K filed with the SEC for 2000 through 2003.

29. Defendants Greenberg, Sullivan, Smith, Castelli, Milton, Murphy and Hoenemeyer are sometimes referred to herein as the Individual Defendants.

30. By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information, including adverse non-public information concerning the Company's services, financial condition, and future prospects, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

31. AIG and the Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information with respect to AIG and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading.

32. Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

33. Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## FRAUD ON THE MARKET PRESUMPTION

34. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

   a. Defendants made public misrepresentations or failed to disclose material facts regarding AIG's revenues, profits and sales;

   b. The omissions and misrepresentations were material;

   c. The common stock of the Company traded on the New York Stock Exchange ("NYSE"), an efficient and open market;

   d. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock;

   e. Plaintiffs purchased their NYSE stock between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented facts; and

   f. AIG was followed by various analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. At all relevant times, the price of AIG stock reflected the effect of news disseminated in the market.

35. Based on the foregoing, Plaintiffs are entitled to the presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

### Background

36.     AIG is a holding company that, through its subsidiaries, is engaged in a wide range of insurance and insurance-related activities in the United States and worldwide. AIG serves commercial, institutional, and individual customers through an extensive worldwide property-casualty and life insurance network.  Until his resignation on March 14, 2005 as CEO, AIG was run for 38 years by Maurice "Hank" Greenberg.

37.     Under the leadership of Greenberg, AIG was a Company driven to meet analyst estimates and report an increasing stock price to investors at all costs. As disclosed by the Company, AIG was only able to accomplish these goals from 2000 to mid-2005 by engaging in a host of accounting improprieties.

### The Government Investigations

38.     On Monday, February 14, 2005, AIG issued a release stating that subsequent to its earnings release on Wednesday, February 9, 2005, the Company had received subpoenas from the State of New York and the SEC relating to investigations of "non-traditional insurance products and certain assumed reinsurance transactions and AIG's accounting for such transactions." On February 15, 2005, the *Wall Street Journal* further shed light on these subpoenas, reporting that a large reinsurance transaction between AIG and Berkshire Hathaway's General Re was the focus of the SEC investigation.

39.     Indeed, AIG was quite familiar with these "nontraditional insurance products," having recently settled a complaint by the SEC alleging that AIG helped PNC Financial Services Inc. improperly shift volatile assets off its books and helped Brightpoint Inc. cover up losses

10

using a bogus insurance policy. AIG agreed to pay $126 million in penalties and costs to settle these claims.

40. On March 14, 2005, Greenberg announced he would step down as CEO but would remain chairman. Just days before this announcement, on March 11, 2005, Greenberg transferred 41.4 million of his AIG shares to his wife. The transfer represented nearly 90% of Greenberg's holdings in AIG and was valued at the time of the transaction at over $2 *billion*.

41. On March 30, 2005, AIG surprised investors by announcing that contrary to prior disclosures, it would not be filing its annual report on Form 10-K for 2004 on a timely basis. The news caused AIG's stock price to decline from $57.16 to close at $55.41 on March 31, 2005.

42. On May 26, 2005, New York Attorney General, Eliot Spitzer, filed a complaint against AIG and Defendants Greenberg and Smith (the "Spitzer Complaint"). The complaint was based on document production from AIG pursuant to a subpoena as well as tapes of conversations between Greenberg and AIG traders contemporaneously prepared at the time of certain trades.

43. AIG's improper accounting was a deliberate attempt to bolster reserves, hide losses from its underwriting business by mischaracterizing them as investment losses, and inflate revenues from underwriting by falsely reporting an investment in an Alaskan insurance subsidiary of AIG that purchased life insurance policies. For example, the Spitzer Complaint cites internal AIG documents that show there was a clear intent to hide underwriting losses as capital losses by creating offshore insurance companies that were secretly controlled by AIG. AIG transferred underwriting losses to these offshore entities, and when the entities failed, simply took an investment loss. The manner in which the entities were created, and the fact that

AIG's control was hidden, demonstrates an intent to disguise losses from insurance underwriting.

44.     Greenberg also manipulated AIG's stock price by personally instructing the Company's stock traders to purchase AIG shares at critical times. Specifically, the Spitzer Complaint alleged that on February 3, 2005, just two days after AIG announced underwriting losses in AIG's fourth quarter 2004 earnings, Greenberg called one of AIG's traders and ordered him to buy stock with the Company's money. As recounted in the Spitzer Complaint, Greenberg directed "I don't want the stock below $66 so keep buying."

**Boosting Reserves**

45.     On March 30, 2005 AIG issued a press release acknowledging that it engaged in a series of improper accounting actions that had the effect of inflating the Company's revenue, earnings and net worth.

46.     In particular, the Company disclosed that it had engaged in a sham transaction with General Reinsurance Corporation ("General Re") during 2000 and 2001 which served no legitimate purpose and had been undertaken solely to increase AIG's reserves and earnings.

47.     In late 2000, Greenberg personally contacted Ronald Ferguson of General Re to structure a transaction whereby AIG would sell $600 million in reinsurance to General Re in exchange for a $500 million premium. In fact General Re never paid the premium. Rather General Re was paid $5 million by AIG in connection with another transaction in exchange for entering into the sham reinsurance contract. No risk was ever transferred. The reinsurance, however, allowed AIG to book an additional $500 million in total reserves at year-end 2000 and the first quarter of 2001.

48. Since this transaction lacked any economic substance, and consequently, failed to transfer any risk to AIG, the premiums transferred from General Re to AIG, and repayable later, were really a *loan* and not $500 million in premiums as additional reserves, as AIG had previously reported.

49. Indeed, on March 30, 2005, AIG announced that: "Based on its review to date, AIG has concluded that the General Re transaction documentation was improper and, in light of the lack of evidence of risk transfer, these transactions should not have been recorded as insurance." As a result, the Company said it would reduce its reserve figure by $250 million and show that liabilities had increased by $245 million.

50. It has also been disclosed that AIG increased its reserves by making certain "topside adjustments" to its insurance reserves in the process of consolidating the financial statements of AIG's subsidiaries. These included a $32 million topside adjustment in the fourth quarter of 2000, and a $70 million adjustment in the first quarter of 2001. As confirmed by the Company, there was no basis in Generally Accepted Accounting Principles ("GAAP") to support these adjustments. Rather, these increases to reserves had the intended effect of inflating AIG's stated reserves from the fourth quarter of 2000 forward until the Company's restatement in 2005.

**Converting Underwriting Losses to Capital Losses**

51. Insurance underwriting is the basic business of AIG, and Greenberg was particularly concerned about not showing losses in this business. Accordingly, when AIG sustained a loss in its underwriting business, efforts were made to report the loss as an investment loss rather than a loss on its underwriting business.

52. By year end 1999, AIG was facing a loss of $210 million in its automobile warranty business. Instead of booking this loss, in March 2000 Defendant Smith devised a